**IN THE COURT OF APPEALS OF IOWA**

No. 13-1505
Filed October 15, 2014

**STANLEY CHASE BURN,**
    Plaintiff-Appellee,

**vs.**

**JAMES ANTHONY SINCLAIR,**
    Defendant-Appellant.

_____

Appeal from the Iowa District Court for Polk County, Glenn E. Pille, Judge.


A defendant in a defamation action seeks a new trial or a reduction in the punitive damages awarded by the jury.  **AFFIRMED.**


Andrew B. Howie and Frederick B. Anderson of Hudson, Mallaney, Shindler & Anderson, P.C., West Des Moines, for appellant.

Benjamin D. Bergmann of Parrish, Kruidenier, Dunn, Boles, Gribble & Gentry, L.L.P., Des Moines, for appellee.


Considered by Potterfield, P.J., and Tabor and Mullins, JJ.

**TABOR, J.**

What Stanley Burn describes as "a campaign of intimidation, defamation, and harassment," James Sinclair contends was "legitimate and reasonable action to save his marriage and prevent harm to his young son." Burn filed suit alleging defamation, intentional infliction of emotional distress, and assault against Sinclair stemming from a string of events related to Burn dating Sinclair's soon-to-be-former wife. After hearing the evidence, the jury sided with Burn, awarding $25,000 in compensatory and $25,000 in punitive damages.

On appeal, Sinclair challenges the jury instruction on defamation per se, the district court's ruling on his motion for new trial, and the jury's award of punitive damages. Because the jury instruction was proper, the new-trial motion lacked merit, and the punitive damage award was reasonable, we affirm.

## I. Background Facts and Proceedings

In early 2011, Burn filed his original petition, alleging Sinclair "willfully and wantonly engaged in a campaign of intimidation, defamation, and harassment" against him starting in May 2010. The torts alleged—as set out in Burn's amended petition filed in April 2012—were defamation per se, defamation per quod, intentional infliction of emotional distress, and assault.

The district court opened trial on November 26, 2012. The trial testimony established the following significant facts. Sinclair and his wife, Rosa Anthon Sinclair (Anthon), were married in 2003 and had their only son, T.S., in 2006. The Sinclairs experienced marital strife and in April 2010 Anthon moved out of their shared home and into a condominium complex managed by Sinclair. In

May 2010 Anthon met Burn. Although the Sinclairs' divorce was not yet finalized, she began going out with Burn.

Sinclair reportedly became irate when he found out Anthon and Burn were dating. Burn attributed Sinclair's negative reaction to jealousy, but Sinclair testified he did not approve of Burn's presence in T.S.'s life. Burn had a history of criminal offenses, domestic violence, and substance abuse. Burn did not deny his addiction, but stated he has been "clean" since 2008. Sinclair alleged Burn continued to use drugs. While Anthon and Burn denied any abuse in their relationship, Sinclair accused Burn of abusing both Anthon and T.S.

At trial, both men recounted the hostility between them. Sinclair testified Burn would call and threaten to kill him. Burn testified that because Sinclair was the landlord of the condominium complex, he used a master key to let himself into Burn's apartment and twice threatened Burn and Anthon. Both times, Sinclair was arrested. Burn sought and received no-contact orders against Sinclair. The latest no-contact order did not lapse until March 2015.

Burn alleged Sinclair went on a mission to ruin Burn's reputation in the community and with family members. Specifically, Burn's mother received calls and visits from Sinclair who reported Burn was using drugs again and behaving inappropriately with T.S. Sinclair also repeated these allegations to Pastor Tom Allen, who was a father figure to Burn.

In June 2011, Sinclair leveled accusations against Anthon and Burn[1] to the Iowa Department of Human Services (DHS). Sinclair reported that Burn was (1) assaulting T.S., (2) assaulting Anthon, (3) having sex with Anthon in front of T.S. and forcing T.S. to watch, and (4) sleeping naked with five-year-old T.S. in the same bed. The DHS told Anthon about Sinclair's report and an investigator interviewed Anthon and T.S. The DHS also called Burn, told him of the allegations, and interviewed him. At the conclusion of the thirty-day investigation, the DHS informed Burn it had determined Sinclair's allegations were unfounded.

In January 2012, a confidential source contacted DHS and alleged Burn (1) showed T.S. his penis twenty times, (2) touched T.S.'s penis, (3) showed T.S. other parts of Burn's genitals, (4) pulled his pants down and slapped his buttocks in front of T.S., (5) told T.S. he had a "pretty mouth," and (6) slept naked with T.S. Sinclair denied being the complainant for this report.

DHS employee Jennifer Eiteman investigated the allegations. She called Sinclair and told him "about the new child abuse assessment in regards to [T.S.]." In response to Eiteman's questions, Sinclair couched his answers in terms of what then six-year-old T.S. had told him. Eiteman testified:

> On the phone Mr. Sinclair had reported to me that [T.S.] had made a statement that [Burn] had touched his penis. And then [Mr. Sinclair] also reported that [T.S.] had made statements about seeing [Burn's] penis and that he thought it was weird, and that [T.S.] had also made statements in regard to [Burn] slapping his butt on repeated occasions, and that [T.S.] had made comments about witnessing his mother and [Burn] engage in sexual activity, and that he had reported having heard them make funny noises when they were under the covers together.

---

[1] Sinclair testified he did not report Burn, he reported Anthon and her paramour and did not use Burn's name. It is undisputed that the paramour allegation referred to Burn.

Sinclair also told Eiteman about Burn's alleged "pretty mouth" statement. Eiteman scheduled a forensic interview for [T.S.]. She explained:

> A forensic interview is just a complete interview with . . . an *alleged victim of sexual abuse or physical abuse* where the child is interviewed by a specialist at the Child Protection Center, where it's a much more detailed interview, and it's an interview that's also recorded on DVD.

(Emphasis added.) Eiteman called Anthon, explained the allegations, and asked if Anthon would agree to forgo any contact with [T.S.] because it is

> standard [policy] when we have an allegation of sex abuse, or with these types of allegations, it [is] very common for us to assure the child's safety prior to the forensic interview so the child [is] not . . . coerced or coached and to not have contact with the alleged perpetrator until we can get that interview completed. And we try to do that as soon as possible.

Anthon agreed but "was remorseful in the fact that she wasn't going to be able to see her son." Eiteman's first contact with the family was January 19, 2012, and the interview was held on January 30, 2012. Before the forensic interview, T.S. stayed with Sinclair.

At trial, Burn described the notice he received concerning the second report: "I was called by DHS and said I was going to be called in to undergo an investigation on a count of sexual abuse in the second, and that I was going to undergo an investigation at my attorney's office. And that's how I found out about it."

West Des Moines Police Detective Jeff Lyon joined the investigation and was present at the forensic interview. Lyon and Eiteman jointly interviewed Burn,

who denied all the allegations.[2] Besides Sinclair and Burn, Eiteman spoke with Anthon and with T.S.'s therapist. As before, the DHS determined the allegations were unfounded. Eiteman testified T.S. "did not provide statements of sex abuse." Eiteman also testified that at the conclusion of the investigation, no one other than Sinclair vouched for the allegations—"there was no additional support"—and it was "a non-confirmed report. There was not a preponderance of the evidence to say the allegations had occurred."

Burn told the jury his life was negatively impacted by Sinclair's persistent accusations. Burn testified he experienced insomnia, anxiety, depression, and headaches. Additionally, he claimed his relationships with the people contacted by Sinclair had suffered because of the unfounded allegations.

On December 7, 2012, the jury returned a verdict for Burn on all counts. The jury awarded Burn $8000 in general damages, $4000 for loss of reputation, and $13,000 for pain and suffering. The jury also found Sinclair's conduct, directed at Burn, constituted "willful and wanton disregard for the rights of another" and awarded Burn $25,000 in punitive damages. Sinclair moved for judgment notwithstanding the verdict, and alternatively, for a new trial. The district court denied Sinclair's post-trial motions.

Sinclair now appeals.

---

[2] Eiteman testified to the nature of her investigation: "Q. This was not a criminal investigation that you did, correct? A. It was a joint investigation with law enforcement. Q. The one that you did was not a criminal investigation. A. That is correct. It was just in regards to allegations of child abuse."

## II. Jury Instruction on Defamation Per Se

### A. Standard of review

Challenged jury instructions are reviewed for correction of errors at law. *Anderson v. Webster City Cmty. Sch. Dist.*, 620 N.W.2d 263, 265 (Iowa 2000). We review the instructions in their entirety and will not reverse the district court's decision unless prejudicial error has occurred. *Id.* Prejudicial error occurs when the instructions materially misstate the law. *Id.*

### B. Was the jury wrongly instructed on defamation per se?

"Defamation is an invasion of the interest in reputation and good name." *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996). "Defamation includes the twin torts of libel and slander. Libel involves written statements, while slander involves oral statements." *Kiesau v. Bantz*, 686 N.W.2d 164, 174 (Iowa 2004). Defamation comprises "the following elements: (1) publication, (2) of a defamatory statement, (3) which was false and (4) malicious, (5) made of and concerning the plaintiff, (6) which caused injury." *Bierman v. Weier*, 826 N.W.2d 436, 444 (Iowa 2013); *see Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 115 (Iowa 1984) (stating defamation is a malicious publication "tending to injure the reputation of another person or to expose the person to public hatred, contempt, or ridicule or to injure the person in the maintenance of the person's business").

Defamation can either be per se or per quod.[3]  *See Bierman*, 826 N.W.2d at 444.  Words are defamatory "per se if they are of such a nature, whether true or not, that the court can presume as a matter of law that their publication will have libelous effect."  *Vinson*, 360 N.W.2d at 115.  To prove defamation per quod, a plaintiff must prove all six elements, including an injury, "such as injury to reputation."  *Bierman*, 826 N.W.2d at 444.  In contrast, defamation per se statements are "actionable in and of themselves without proof of malice, falsity, or damage."  *Id.*  Those elements are presumed from the nature of the language.  *Vinson*, 360 N.W.2d at 115. But the plaintiff must still prove the element of publication, which requires a third person to hear and understand the defamatory statement.  *Huegerich v. IBP, Inc.*, 547 N.W.2d 216, 221 (Iowa 1996).  "In determining what the third person understands, the defamatory statement must be viewed in the context of the surrounding circumstances and within the entire communication."  *Id.*

The district court determined nine of the statements Sinclair allegedly made to third parties about Burn constituted "slander (defamation) per se."  Out of those nine, Sinclair now challenges two—(g) and (h), *italicized below*.  Sinclair

---

[3] "Under Iowa law, whether a statement is defamatory 'must be determined by giving to the subject-matter thereof, as a whole, that meaning which naturally belongs to the language used.'" *Lundell Mfg. Co. v. Am. Broad. Cos.*, 98 F.3d 351, 359 (8th Cir. 1996) (quoting *Kiner v. Reliance Ins. Co.*, 463 N.W.2d 9, 14 (Iowa 1990)).

A much older case paints a clearer picture of the standard by which the court judges the character of statements as defamatory.  "[The words] are to be understood in their plain and popular sense, in the sense in which fairly intelligent English-speaking people would ordinarily understand them."  *Fleagle v. Downing*, 168 N.W. 157, 159 (Iowa 1918).

claims the district court erred in finding, as a matter of law, the two statements were defamation per se. The jury instruction stated:

> In order to prove his claim of defamation per se, the Plaintiff must prove the following proposition:
> 1. The Defendant made one or more of the following statements to the following third parties:
> . . . .
> f. The Defendant stated to the Department of Human Services that Plaintiff had touched [T.S.'s] penis.
> *g. The Defendant stated to the Department of Human Services that [T.S.] saw [Burn's] penis.*
> *h. The Defendant stated to the Department of Human Services that Plaintiff sleeps in the same bed naked with [T.S.].*
> i. The Defendant stated to the Department of Human Services that Plaintiff and Anthon Sinclair have sex in front of [T.S.].
> The Court has determined that any of the above claimed statements, if made, would constitute slander (defamation) per se. No further proof of damage is required. The very nature of the words [is] presumed to be defamatory.

In Iowa, language accusing a plaintiff of immorality is defamation per se. *Bierman*, 826 N.W.2d at 464; *see McFarland v. McFarland*, 684 F. Supp. 2d 1073, 1086 (N.D. Iowa 2010) (accusing the plaintiff of adultery is defamation per se); *Kiesau*, 686 N.W.2d at 178 (publishing a doctored image of plaintiff appearing topless is defamation per se).

"'If a statement is clear and unambiguous, the issue of whether the statement is [slanderous] per se is for the court.'" *Bierman*, 826 N.W.2d at 464 (quoting *Kiesau*, 686 N.W.2d at 175). The court may find a statement is slanderous per se if it unambiguously tends to provoke the plaintiff's anger or "expose him to public hatred, contempt, or ridicule." *Id.* In making its determination, the court considers the "very nature of the language used." *Id.* at 444.

Sinclair contends the challenged statements are ambiguous and not defamatory per se. He correctly points out that where the language is capable of two meanings, it is for the jury to decide which meaning was the one conveyed. *See Rees v. O'Malley*, 461 N.W.2d 833, 835 (Iowa 1990).

The *Rees* case is helpful to our resolution of this issue. *See id.* Plaintiff Rees wanted to purchase a city lot. *Id.* at 834. Defendant O'Malley was an attorney representing other interested buyers, the Punellis. Both Rees and the Punellis owned land abutting the city lot. *Id.* During O'Malley's presentation to the city council, he stated: "If you sell that property to Mr. Rees and what the devil he will use it for . . . I don't know, other than for extortion." *Id.* Later in the meeting, O'Malley stated: "Well, [Rees] has written me a letter and kinda says you can have it that is why I politely used the word extortion, I probably shouldn't have used the word extortion, but the only thing I can think of is he will probably sell it back." *Id.*

Rees sued claiming O'Malley's comments constituted slander per se, the trial court instructed the jury on slander per se, and the jury returned a verdict in favor of Rees. *Id.* On appeal, O'Malley claimed he was not liable because the word extortion is "ambiguous." *Id.* at 836. Our supreme court rejected this claim by analyzing O'Malley's statements *in context*:

> O'Malley intended to accuse Rees of threatening to harm Punellis' business, and the audience understood O'Malley's statements to mean that Rees was threatening to harm Punellis' business. O'Malley accused Rees of extortion while explaining that Rees had no use for the city property because it was too small and that if the property were sold to Rees it would destroy Punellis' business. Further, O'Malley suggested that if the property was sold to Rees, he would end up selling it to Punellis after extorting Punellis.

*Clearly, in the context of this discussion, O'Malley's reference to extortion is unambiguous.* O'Malley intended to state that Rees had threatened to buy the property and force Punellis off the city lot, harming their business, unless Punellis did as Rees wished.

*Id.* (emphasis added). The *Rees* court concluded the "evidence establishes that O'Malley's statements unambiguously accused Rees of extortion; therefore, the district court correctly ruled that his statements constituted slander per se." *Id.*

Similarly, Sinclair made his challenged statements in the context of DHS investigator Eiteman telling Sinclair she was conducting a "new child abuse assessment." "Clearly, in the context of this discussion"—a new child abuse assessment—Sinclair's statements of "T.S. seeing Burn's penis" and "Burn sleeps in the same bed naked with [T.S.]" are unambiguous allegations of immorality and are of the nature to provoke Burn's anger or "expose him to public hatred, contempt, or ridicule." *See Bierman*, 826 N.W.2d at 464 ("We agree with the district court that 'stating a person has been molested by their father and suffers from bipolar disorder constitutes libel per se under Iowa law.'").

As in *Rees*, we conclude the evidence establishes Sinclair's statements unambiguously accused Burn of immorality; therefore, the district court correctly ruled the challenged statements constituted slander per se. *See Wilson v. IBP, Inc.*, 558 N.W.2d 132, 139 (Iowa 1996) ("Iowa law is clear that an attack on the integrity and moral character of a party is [defamation] per se.").

### III.    Denial of Sinclair's Motion for New Trial

Sinclair alleges the district court erred (1) in allowing testimony from Burn about the second DHS investigation, (2) in admitting alleged defamatory statements not pleaded, and (3) by allowing Anthon to return to the witness stand

in violation of a sequestration order. Sinclair alleges all three incidences unfairly prejudiced him and thus each would warrant a new trial.

A. *Standard of review*

"[District] courts have broad but not unlimited discretion in ruling on motions for new trials." *Benson v. Richardson*, 537 N.W.2d 748, 762 (Iowa 1995). We will not disturb the ruling unless the evidence clearly shows the court has abused its discretion. *Id.* Abuse of discretion occurs when the court has exercised its discretion based on "untenable grounds or acted unreasonably." *Id.*

B. *Did Sinclair's motion in limine preserve error regarding Burn's testimony concerning the second DHS investigation?*

Sinclair contends the court should not have allowed Burn to testify about the second DHS investigation. In a motion in limine, Sinclair attempted to prevent Burn from testifying specifically about sexual abuse in the second degree—a consideration during the second DHS investigation—for which Burn was never charged. Sinclair alleged he would be unfairly prejudiced because the State did not charge Burn and there was no evidence Sinclair was the complainant who prompted the investigation. In its pretrial ruling on the motion in limine, the court stated,

> [T]he Court, notwithstanding the plaintiff's objections, is going to grant [that portion of the motion] at this point in time without prejudice to the plaintiff to again bring that to the Court's attention prior to attempting to introduce any evidence or comments in front of the jury regarding that particular matter.

While the district court issued a preliminary decision the material was inadmissible, the court left the door open for further discussion on the topic and,

in fact, invited reconsideration of the issue at a later time. Because the court's ruling on the motion in limine was not the final word on admissibility of this evidence, Sinclair was required to object at trial. *See Quad City Bank & Trust v. Jim Kircher & Assocs., P.C.*, 804 N.W.2d 83, 90 (Iowa 2011) (repeating general principle that ruling sustaining motion in limine does not preserve error without timely objection when evidence is offered at trial).

During his testimony, Burn discussed the material Sinclair originally sought to exclude. Sinclair objected on hearsay grounds, but not on the basis advanced in the limine motion. Accordingly, Sinclair has not preserved error and we decline to consider this issue on appeal.

C. *Did the district court abuse its discretion by refusing to grant Sinclair a new trial based on the admission of statements by Gina Marty concerning the intentional infliction of emotional distress claim?*

Before trial, the court considered Sinclair's request to exclude testimony concerning defamatory statements not included in Burn's pleadings, ruling: "the Court grants the Motion in Limine to the extent that the plaintiff would try to introduce or allege certain defamatory statements outside what has been alleged in the petition or the amended petition as being the defamatory statements and causes of action in regard to that."

On appeal, Sinclair focuses on testimony from plaintiff's witness Gina Marty, who was a family friend of the Sinclairs and the maid of honor at their wedding. Burn's counsel called Marty in support of the claim of intentional

infliction of emotional distress. Before Marty testified the court outlined limitations for the jurors:

> I'm admonishing the jury that any statements allegedly made by Mr. Sinclair to Ms. Marty during those telephone conversations may not be considered by you in regard to the plaintiff's claims of defamation. And the specific defamatory remarks which form the basis of the plaintiff's claims for defamation will be given to you in the jury instructions in this matter. The Court will allow her, however, to testify to the statements made.

Marty then testified to telephone conversations with Sinclair in April 2012 during which Sinclair allegedly told her Burn was being abusive toward Anthon and T.S., Burn was using drugs again, and Burn robbed Dos Rios restaurant. Marty had only met Burn in March 2012. Marty said when she conveyed these allegations to Anthon and Burn, Burn was "very hurt, because it made me second guess his character."

In addition to the in-court admonition, the court instructed the jury at the close of the case that any statements allegedly made by Sinclair—other than the nine statements deemed to be defamatory per se in another instruction—"may not be considered by the jury in regard to the Plaintiff's claims of defamation. However, such other statements may be considered in regard to other claims made by the parties."

Sinclair argues, despite the district court's limiting instructions, the jury could not separate the defamatory statements relayed by Marty, which were not included in Burn's pleadings, from the allegations of defamation, which were included in the petitions. Sinclair contends the prejudice he suffered from Marty's testimony warrants a new trial.

As a general rule, "juries understand limiting instructions." *Beeman v. Manville Corp. Asbestos Disease Comp. Fund*, 496 N.W.2d 247, 252 (Iowa 1993). "To believe otherwise would be asking appellate courts to speculate that a jury disregarded evidence and clear admonitions." *Id.* We entertain a strong presumption that proper limiting instructions can be successful in reducing any possible prejudice to tolerable levels. *Id.*

In this case, the judge gave the jury not one, but two admonitions concerning the fair use of Marty's testimony. Moreover, the jury received an instruction listing the nine statements being alleged as defamation; the instruction identified those per se defamatory statements as being allegedly made either to Pastor Tom Allen or to the DHS. In light of all the instructions, a reasonable juror would be capable of considering the statements Sinclair allegedly made to Marty as distinct from the statements to Allen or the DHS. The district court did not abuse its discretion in denying Sinclair's motion for new trial on this ground.

D. *Did the district court abuse its discretion by refusing to grant Sinclair's motion for new trial based on an alleged sequestration violation?*

The court imposed a sequestration rule for witnesses during the trial. Anthon testified both in the plaintiff's case in chief and on rebuttal. After her rebuttal testimony, she remained in the courtroom for Sinclair's surrebuttal testimony, which was the only testimony she heard during the lengthy trial. On surrebuttal, defense counsel asked Sinclair five questions and offered into evidence a photographic exhibit purporting to show injuries Sinclair allegedly

suffered at the hands of Anthon. Sinclair testified his injuries were caused when Anthon "pushed me down the steps."

Burn's counsel then sought to recall Anthon for the limited purpose of addressing the surrebuttal testimony and exhibit. Sinclair objected to Anthon testifying on the grounds of sequestration order. The district court overruled the objection, stating: "A new area has been mentioned, so I'm going to allow the testimony." Anthon testified she did not cause the injuries to Sinclair shown in the photographic exhibit: "I never pushed him. I never did anything. He was so drunk that he just went tumbling down."

On appeal, Sinclair claims "Anthon's testimony constituted an irregularity in the proceeding, misconduct by Burn to put on a sequestered witness, and surprised Sinclair and unduly prejudiced Sinclair by allowing [Anthon] to tailor her testimony through what she heard."

Iowa has no statute or rule providing for the exclusion or sequestration of witnesses. *Frazier v. State Cent. Sav. Bank*, 217 N.W.2d 238, 245 (Iowa 1974). Instead, a sequestration rule may be enforced by judicial decision. *Id.* The purpose of a sequestration order is to lessen the danger of perjury by minimizing the ability of witnesses to have their testimony "colored by what has gone before." *In re Smith's Will*, 60 N.W.2d 866, 870 (Iowa 1953). A trial court has "reasonable discretion in disqualifying a witness who has violated an exclusionary order. It must be expected this discretion will be exercised in a spirit of fairness and so that it will not unjustly deprive a litigant of helpful testimony." *Id.*

The district court did not abuse its discretion in allowing the plaintiff to recall Anthon for the limited purpose of addressing Sinclair's surrebuttal accusation. Anthon answered just two questions on a "new area" raised by Sinclair. She did not tailor her testimony based on what she heard from her ex-husband. Rather, she outright denied his claim of assault. Her denial would have been the same had she heard his testimony or not. Sinclair cannot legitimately claim surprise because he personally injected the issue of the cause of his injuries into the trial.

In the circumstances of this back-and-forth, "he said, she said" testimony, we find no abuse of discretion in the district court's decision to allow Anthon to retake the witness stand despite the violation of the sequestration order. By the same token, the district court did not abuse its discretion in refusing to grant Sinclair's motion for new trial on this ground. A district court may only grant a new trial if the asserted ground would materially affect the movant's substantial rights. *See* Iowa R. Civ. P. 1.1004. We do not find Anthon's limited testimony on this point materially affected Sinclair's substantial rights.

## IV. Punitive Damages

A. *Standards of review.* We review an award of punitive damages for correction of errors at law. *Wolf v. Wolf*, 690 N.W.2d 887, 893 (Iowa 2005). We review de novo a claim that a punitive damage award is excessive, in violation of the due process clause. *Id.* at 894.

B. *Did the record support the jury's award of punitive damages?*

To merit punitive damages, the plaintiff must prove "'by a preponderance of clear, convincing, and satisfactory evidence'" that the defendant acted in willful and wanton disregard for the rights or safety of another. *Id.* at 893 (quoting Iowa Code § 668A.1). Further, "[t]o receive punitive damages, plaintiff must offer evidence of defendant's persistent course of conduct to show that the defendant acted with no care and with disregard to the consequences of those acts." *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co.*, 510 N.W.2d 152, 156 (Iowa 1993).

Here, the jury awarded $25,000 in compensatory and $25,000 in punitive damages. Sinclair argues the record does not contain substantial evidence that he acted willfully or with reckless indifference to the rights of others. Rather, Sinclair characterizes his actions as those of a father trying to save his marriage and to keep his son away from "a violent drug user, drug seller."

We find Burn presented substantial evidence backing his claim for punitive damages. Despite multiple no-contact orders, Sinclair continued to confront Burn with the intent to intimidate him. Sinclair let himself into Burn's home and broke Burn's window. He contacted Burn's friends and family and told them falsehoods about Burn. Finally, Sinclair accused Burn of sexually abusing T.S., an accusation which DHS determined to be unfounded. The totality of Sinclair's actions and his persistence in contacting Burn and Burn's loved ones supports an award of punitive damages by a preponderance of clear, convincing, and satisfactory evidence.

C. *Was the punitive damage award excessive?*

Sinclair finally argues, even if punitive damages were appropriate, the amount of the award was excessive.

Our primary focus in reviewing a punitive damage award is the relationship between the amount of the award and the offending party's wrongful conduct. *Ryan v. Arneson*, 422 N.W.2d 491, 496 (Iowa 1988). While strict mathematical ratios are disfavored, they are considered. *Id.*

Sinclair admits the 1:1 ratio of compensatory to punitive damages in this case is a ratio often upheld under Iowa law. *See Wolf*, 690 N.W.2d at 895 (affirming a compensatory damage award of $1 and a punitive damage award of $25,000—a significantly more disparate ratio than the one herein). But Sinclair nevertheless argues the punitive damage award is unjustified based on the minimal harm suffered by Burn.

We disagree that the punitive damage award outpaced the plaintiff's injuries. Burn testified he continues to experience the after-effects of Sinclair's actions in the form of insomnia, chronic anxiety, depression, and headaches. Moreover, Burn's personal relationships have suffered.

In addition, we find legitimate deterrence value in the amount of the punitive damage award. *See Tullis v. Merrill*, 584 N.W.2d 236, 241 (Iowa 1998) (upholding punitive damage award because sum awarded would "deter future misconduct and is not so out of proportion to the actual damages as to shock the conscience"). On our de novo review, we see no reason to reduce the punitive damage award.

**V. Conclusion**

In sum, the court properly instructed the jury regarding defamation per se because the challenged comments, made in the context alleged, are not subject to a non-defamatory meaning. The court also acted within its discretion in refusing to grant a new trial based on testimony objected to by Sinclair. Finally, the punitive damages were supported by the evidence and not excessive. Finding no merit in Sinclair's appellate claims, we affirm.

**AFFIRMED.**