# IN THE SUPREME COURT OF IOWA

No. 19–2086

Submitted April 20, 2022—Filed June 17, 2022

**JERRY HOFFMANN** and **HOFFMANN INNOVATIONS, INC.,** d/b/a **DIY AUTOTUNE,**

>   Appellees,

vs.

**SCOTT CLARK** and **REALTUNERS, LLC,**

>   Appellants.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Pottawattamie County, Susan Christensen and Margaret Reyes, Judges.

Defendants seek further review of a court of appeals ruling affirming the jury's verdict on libel-per-se damages and punitive damages. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

McDermott, J., delivered the opinion of the court in which all participating justices joined. Christensen, C.J., took no part in the consideration or decision of the case.

Matthew G. Sease (argued) and Kylie E. Crawford (until withdrawal) of Sease & Wadding, Des Moines, for appellants.

Seth N. Katz (argued) of Shepherd Law, LLC, Atlanta, Georgia, and Robert M. Livingston of Stuart Tinley Law Firm, LLP, Council Bluffs, for appellees.

**McDERMOTT, Justice.**

A jury awarded Hoffmann Innovations, Inc., and its owner Jerry Hoffmann $11 million in compensatory and punitive damages against a fired employee, Scott Clark, and his new competing company based mainly on defamatory statements that Clark made on social media, online forums, and in podcasts. During the course of the litigation, the district court sanctioned Clark for violating a consent order that prevented both sides from making any statements about one another—particularly online statements—outside the litigation. But the court's contempt orders and sanctions for Clark's violations of the consent order didn't stop Clark from continuing to disparage Hoffmann. After several failed attempts to secure compliance with increasing sanctions, the court struck Clark's pleadings—most importantly, his answer and affirmative defenses. Without any defense pleaded to the petition's claims, trial proceeded on the only outstanding issue: the amount of damages.

Clark and his business appealed the $11 million verdict, arguing principally that the district court erred in striking their pleadings and that the verdict was excessive. We transferred the case to the court of appeals, which affirmed the district court's judgment. Clark and his business sought further review, which we granted.

I.

Jerry Hoffmann is the CEO and part-owner of Hoffmann Innovations, Inc., a Georgia-based corporation that does business as DIY AutoTune. The company provides products and training for do-it-yourself "car tuning," a general term

that refers to modifications to improve the appearance, performance, or handling of a vehicle from its original design. Hoffmann Innovations during times relevant to this case employed around twenty people. Clark was hired based on his acknowledged car tuning abilities. At Hoffmann Innovations, he conducted tuning classes for Hoffmann's customers on how to use Hoffmann's highest-end products, all in an effort to "create an army" of tuning enthusiasts who knew how to use the company's offerings. Clark also performed engine tuning for Hoffmann Innovations' sponsored racers. Clark signed a noncompete agreement with Hoffmann Innovations that prevented him from owning or managing any competing entity for two years after ending employment and that prevented him from disclosing any of Hoffmann Innovations' confidential business information or trade secrets.

Hoffmann fired Clark in August 2016, about a year and a half into Clark's tenure with Hoffmann Innovations, citing workplace misconduct and insubordination. Hoffmann claimed that Clark had conducted secret training classes using Hoffmann Innovations' products and materials and kept the profits for himself. Hoffmann recorded the phone call when he fired Clark. During the call, Clark requested a severance package and suggested that if he didn't receive one, he might make a "social media stink." About seven months after he was fired, Clark created his own entity, RealTuners, LLC, which would compete with Hoffmann Innovations' tuning classes.

In July 2017, Hoffmann and Hoffmann Innovations sued Clark and RealTuners for defamation, civil extortion, breach of the employee duty of loyalty,

breach of contract, and unjust enrichment. Clark's and RealTuner's answer denied these claims; asserted an affirmative defense that the statements were truthful; counterclaimed for defamation, intentional interference with prospective business advantage, and invasion of privacy (false light); and requested an injunction.

About six months into the lawsuit, the parties jointly moved for the court to enter a consent order—an order from the court based on the voluntary agreement of the parties to be bound—in an attempt to prevent further harm to either side should one make defamatory statements about the other. By its terms, the order prevented either party

> from making any disparaging or critical statements, express or implied, regardless of truth or falsity, in any form, written or oral (including but not limited to emails and online statements/postings), about an adverse Party to this case, to anyone (other than counsel and the Court). This applies to all statements about the Parties, including but not limited to about their businesses, owners and employees, their capabilities, their services, their reputation, their products, their methods of operation and business practices, their customers, their policies and/or business partners.

The consent order also prevented the parties from providing a platform for third parties to make disparaging comments about the other party and from filing any new complaints against each other. And finally, the order instructed that if they were asked by a third party about the other's abilities, products, employees, or services, they would respond, "I cannot comment. The Parties are involved in litigation." The order stated that a violation of its terms may result in sanctions, including reasonable attorney fees.

Starting within about two months of the court's entry of the consent order, Hoffmann and Hoffmann Innovations started bringing separate motions for sanctions against Clark and RealTuners for violations of the consent order—twelve in total over the next year. Most of the motions alleged that Clark or RealTuners made disparaging statements on Facebook about Hoffmann personally, Hoffmann Innovations' products, Hoffmann Innovations' business practices, and even the judges assigned to the case. One day after Hoffmann and Hoffmann Innovations' second motion for sanctions, Clark's attorney moved to withdraw from the case, citing a breakdown in the attorney–client relationship. The court of appeals opinion in this case provides a detailed summary of each of the motions for sanctions. *Hoffmann v. Clark*, No. 19-2086, 2021 WL 1907746, at *3–11 (Iowa Ct. App. May 12, 2021).

Clark proceeded pro se for a time, representing himself on about a half-dozen motions for sanctions and several contempt proceedings for violating the district court's orders. A pattern developed in which Clark would agree at a sanctions hearing to stop posting comments in violation of the consent order, and then shortly thereafter would post on social media or racing industry forums that Hoffmann Innovations' products were faulty or that Hoffmann was paying people to lie about the products. Some of Clark's more egregious violations over the year include the following:

- Filing a petition for civil protection against Hoffmann in Iowa claiming that Clark and his fiancée feared Hoffmann (who lived in Georgia); a filing that the district court suggested contained falsified evidence.

- Referring to Hoffmann Innovations' products and stating, "Nothing sucks worse than shooting the dice on a $1200 box except when tech support is ordered to lie to you about the problem."

- Selling "Free RealTuners" t-shirts online and stating about the litigation, "The other parties all are involved in this because they are actively communicating with my customers in an effort to steer business away from us. All of those businesses accept royalties from diy [Hoffmann Innovations] sales and all were aware of product problems but kept quiet in order to keep royalties flowing. . . . According to what Jerry Hoffmann has told me while employed there."

- Stating that "[t]his is a story about big money trying to silence a whistle blower. Do you know what can happen when your fuel injectors are locked open on a running engine? A couple people discovered the hard way and I'll be talking about that."

- Making statements suggesting that the judge had been paid by Hoffmann's lawyers to rule against him.

- Posting a link to the district court judge's personal Facebook page and referring to her as a "social media starlet."

After Hoffmann's fourth motion for sanctions and after the court had held two other hearings for sanctions, the court sanctioned Clark by striking his answer and counterclaims. With his answer and counterclaims struck, Hoffmann's allegations in the petition were deemed admitted, and the only remaining issue for trial was Hoffmann's and Hoffmann Innovations' damages.

The district court also ruled that Clark had committed a bevy of discovery violations for refusing to turn over social media information from his personal, business, and two alias accounts. The district court held Clark in contempt at least six times. He was repeatedly fined and, several times, even sentenced to jail for his contempt: once for thirty days, once for an indefinite term until he complied with discovery, and once for sixty days. Indeed, Clark failed to appear

at a hearing because he feared incarceration. He stated that he needed to leave Iowa and posted online that it was "because some shady judges, lawyers, and a hyper-wealthy stalker who believes Jesus told him to kill me, are winning." This caused the court to issue a warrant for his arrest. Clark never paid any of the fines or attorney fees for his court-ordered sanctions.

Before trial, the plaintiffs submitted with their proposed jury instructions a list of "undisputed facts for trial" from the facts in the petition. Over an objection from Clark's new lawyer at trial, the district court read these facts to the jury and later provided them to the jury with the jury instructions. Hoffmann also filed, and the court granted, a motion in limine to prevent Clark from presenting any evidence of a defense, any misconduct by the plaintiffs, any of his own damages, any statements about the parties' wealth or success, and the fact that his answer and counterclaim were struck.

The district court held a three-day jury trial. Clark's lawyer attended, but Clark didn't attend any part of it. Hoffmann testified at trial about Clark's conduct and the impact it had both on him personally and on Hoffmann Innovations' business. Hoffmann testified that he was seeking damages to his company's reputation for $4.5 million, which he based on the company's growth rate in the years immediately before Clark had started defaming him. But Hoffmann clarified on cross-examination that his $4.5 million damages calculation was based on gross revenues and not lost profits. Neither Hoffmann nor Clark introduced Hoffmann's tax returns to show profits and losses. Hoffmann testified that there were "countless customers that would post on

Facebook" saying "they would never buy from [Hoffmann] again" and that they "used to buy from [Hoffmann] all the time and [they] never will again." He said he lost business relationships, giving an example of one in particular that Hoffmann believed would have created $250,000 in additional revenue, 40% of which would have been profit. Hoffmann also testified that, because of Clark's postings falsely accusing him of manufacturing dangerous products (including products that could catch fire) and of placing profits ahead of product safety, his employees were consistently diverted from their regular duties to responding to customer product returns.

Hoffmann also requested $1 million for damage to his personal reputation. When asked how he arrived at that number, Hoffmann responded, "That's a hard number to come up with in some sense; right? I mean, how much do you value your reputation?" Continuing, he answered, "What's your name worth, and how do you put a number on that? I don't know. I had a—I had a good name."

Clark's attorney attempted to question Hoffmann about a felony conviction, illegal drug use, Clark's favorable statements about Hoffmann's products, whether Hoffmann Innovations' products had ever failed, and whether Hoffmann ever tried to "strike back" at Clark. The court prevented Clark's cross-examination on these issues after objections from Hoffmann's counsel based on Hoffmann's motion in limine on these subjects. Clark's attorney was permitted to ask Hoffmann whether his products ever started a fire or whether customers complained about the products starting a fire, and Hoffmann responded "no" to both questions. Hoffmann also conceded on cross-

examination that there were at least some people who didn't believe Clark's statements.

Hoffmann's wife also testified about the effect Clark's conduct had on her husband, including the violations of the consent order. Clark presented no evidence to rebut Hoffmann's damages claims aside from his attempts to question Hoffmann about a felony conviction or Hoffmann's allegedly faulty products.

The court granted Hoffmann's motion for a directed verdict for each cause of action and instructed the jury to decide only the question of damages. The court also permitted a spoliation instruction based on evidence that Clark had failed to turn over requested discovery materials. The jury awarded damages in roughly the amounts Hoffmann requested. It awarded Hoffmann personally $500,000 from Clark and $500,000 from RealTuners for libel per se ($1 million total). The jury awarded Hoffmann Innovations $2,060,250 from Clark and the same amount from RealTuners ($4,120,500 total). The remaining compensatory damages were for Hoffmann Innovations against Scott Clark: $27,000 for breach of fiduciary duty, $102,500 for breach of contract, and $250,000 for civil extortion. The jury thus awarded a total of $5.5 million in compensatory damages. The jury also awarded punitive damages against Clark for $2 million and against RealTuners for $3.5 million. The total verdict came to $11 million. The district court also granted the plaintiffs' request for common law attorney fees (awarded despite no contractual or statutory provision for such fees) for $210,743.21.

On appeal, Clark and RealTuners argue that the district court abused its discretion by striking their answer and counterclaims, reading the one hundred admitted facts to the jury, restricting their ability to introduce evidence to refute Hoffmann's damages, refusing to grant a new trial or remittitur for an excessive verdict, and awarding common law attorney fees. Clark also argues that there was insufficient evidence for the jury's calculations of damages for civil extortion and libel per se in particular.

The court of appeals affirmed the district court on each issue presented. Clark and RealTuners requested further review of the court of appeals ruling, which we granted.

## II.

We have the discretion to choose which issues we decide on further review. Iowa R. App. P. 6.1103(1)(*d*). We will address the issue of whether the libel per se and punitive damage awards were excessive and, if so, whether a new trial or remittitur is the appropriate remedy. The court of appeals decision stands as the final judgment on all other issues raised on appeal. *See Holmes v. Pomeroy*, 959 N.W.2d 387, 389 (Iowa 2021).

## A.

Defamation generally comes in two types: libel and slander. Libel is a defamatory statement expressed in writing or some other fixed medium. *Bauer v. Brinkman*, 958 N.W.2d 194, 198 (Iowa 2021). Slander is a defamatory statement expressed in spoken words. *Id.* Libel claims come in two types: libel *per quod* and libel *per se*. Libel per quod requires an audience to "refer to facts

or circumstances beyond the words actually used to establish the defamation." *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996). For libel per quod, the defamatory nature of the statement isn't immediately apparent and requires some other fact to reveal it. *See id.* A plaintiff in a libel per quod action bears the burden to prove that they suffered some sort of reputational damage from the statement. *Bierman v. Weier*, 826 N.W.2d 436, 444 (Iowa 2013).

Libel per se, on the other hand, refers to statements "of such a nature, whether true or not, that the court can presume as a matter of law that their publication will have libelous effect." *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 116 (Iowa 1984). These are statements that, on their face, have an obvious defamatory character. For example, publishing "Doe is an embezzler" might be an example of libel per se. *See Brown v. First Nat'l Bank of Mason City*, 193 N.W.2d 547, 551–53 (Iowa 1972). Statements that are libelous per se "have 'a natural tendency to provoke the plaintiff to wrath or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse.' " *Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 222 (Iowa 1998) (quoting *Johnson*, 542 N.W.2d at 510).

Plaintiffs are not required to prove damages for defamation per se. *Rees v. O'Malley*, 461 N.W.2d 833, 839 (Iowa 1990). Defamation per se is thus "an oddity of tort law" because it "allows recovery of purportedly compensatory damages without evidence of actual loss." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974).

In *Bierman v. Weier*, the defendants argued that we should require plaintiffs in all defamation cases to prove falsity, fault, and damages to reputation based on "the rise of the Internet and electronic publishing." 826 N.W.2d at 448. We declined to do so, finding "libel per se remains a useful rule in an area where it is often difficult for a plaintiff to prove actual damages." *Id.* at 454. We noted that "[i]n our present-day world, accusations can be spread quickly and inexpensively," and thus "libel per se plays a useful role in helping to keep our social interactions from becoming ever more coarse and personally destructive." *Id.* at 455.

While we presume damages and will impose no burden on the plaintiff to prove damages for libel per se, we've also stated that "evidence of reputation and extent of publication *is* necessary so that a jury can determine the extent of injury." *Rees*, 461 N.W.2d at 839 (emphasis added). In *Rees v. O'Malley*, we approvingly cited a published court of appeals decision that found "damages may not be awarded based upon the defamatory material alone and no other evidence" and must rest on evidence such as the nature of the plaintiff's reputation prior to the defamation and the extent of publication of the defamatory statements. *Id.* (citing *Kelly v. Iowa State Educ. Ass'n*, 372 N.W.2d 288, 300 (Iowa Ct. App. 1985)); *accord Lara v. Thomas*, 512 N.W.2d 777, 786 (Iowa 1994). Further back our own court, in *Brown v. First National Bank of Mason City*, said that recovery under a claim for libel per se "is limited to those damages which were a natural and probable consequence of the original libel or

its repetition or republication." 193 N.W.2d at 555; *accord Wilson v. IBP, Inc.*, 558 N.W.2d 132, 140 (Iowa 1996) (en banc).

Yet our cases also include statements that might seem to suggest no such requirement for any evidence of the nature or extent of publication or harm. In *Schlegel v. Ottumwa Courier*, we stated that "the jury is allowed to award substantial damages *without* the necessity of the plaintiff proving actual damage to reputation" and that "damage to reputation is conclusively presumed from the publication of the libel." 585 N.W.2d at 222 (emphasis added). Commentators have noted the law in this area is confusing and courts have muddied the waters by blending terms. *See* 2 Rodney A. Smolla, *Law of Defamation* § 7:1, Westlaw (2d ed. updated May 2022) [hereinafter *Law of Defamation*]; Julie C. Sipe, *"Old Stinking, Old Nasty, Old Itchy Old Toad": Defamation Law, Warts and All (A Call for Reform)*, 41 Ind. L. Rev. 137, 152 (2008) ("Whether a case involves libel or slander, per se or per quod, there is at least one more conundrum in defamation law: when may damages be presumed?").

The Restatement offers a useful way of thinking about libel per se damages to reconcile our seemingly disparate treatments in cases. It describes *special* damages, which result from "the loss of something having economic or pecuniary value," and *general* damages, which are "imposed for the purpose of compensating the plaintiff for the harm that the publication has caused to his reputation," including emotional damages. Restatement (Second) of Torts § 621 cmt. *a* (Am. L. Inst. 1977) [hereinafter Restatement]; *see also id.* § 569 cmt. *c* (discussing constitutional requirements related to special damages).

In a libel per se claim, *general* damages are the "presumed" damages. *See id.* § 621 cmt. *a.* General damages must still relate to the actual harm caused by the publication, but the amount of damage to reputation is usually left in the jury's discretion. *Tathwell v. City of Cedar Rapids*, 97 N.W. 96, 97 (Iowa 1903). Although plaintiffs aren't required to prove *special* damages to recover for libel per se—because they may recover presumed *general* damages—plaintiffs must still prove special damages if they wish to recover special damages. *Vojak v. Jensen*, 161 N.W.2d 100, 107 (Iowa 1968) ("General damages are presumed and special damages need not be shown when a publication is libelous per se."), *abrogated on other grounds by Barreca v. Nickolas*, 683 N.W.2d 111, 119 & n.5 (Iowa 2004); *Simons v. Harris*, 245 N.W. 875, 876 (Iowa 1932) ("The language shown to have been used is slanderous per se, which means it is slanderous without proof of special damages."). Put another way, special damages are not presumed damages, nor are they a necessary element of recovery for libel per se.

## B.

Having clarified the proof required for the different species of libel per se damages, we analyze whether the amounts awarded by the jury were excessive. "When we review claims for excessive damages, 'we view the evidence in the light most favorable to the plaintiff.' " *Stender v. Blessum*, 897 N.W.2d 491, 501 (Iowa 2017) (quoting *Kuta v. Newberg*, 600 N.W.2d 280, 284 (Iowa 1999)). "In determining whether the damage award is excessive, we must abide by the principle that each case depends upon its own facts, and precedents are of little value." *Rees*, 461 N.W.2d at 840. We review the trial court's decision upholding

a verdict using an abuse of discretion standard since "the trial court had the advantage of seeing and hearing the evidence." *Stender*, 897 N.W.2d at 501.

We come to a claim of an excessive award disinclined to disturb the jury's verdict and will only intervene if we find it "flagrantly excessive or inadequate," "so out of reason as to shock the conscience or sense of justice," "a result of passion, prejudice or other ulterior motive," or "lacking in evidentiary support." *Rees*, 461 N.W.2d at 839 (quoting *Olsen v. Drahos*, 229 N.W.2d 741, 742 (Iowa 1975)). Determination of damages "is peculiarly within the discretion of the jury," but "this discretion is not unlimited." *Brause v. Brause*, 177 N.W. 65, 68 (Iowa 1920).

On the award of damages to Hoffmann Innovations, Hoffmann described what are *special* damages to the business in arriving at his $4.5 million calculation. But Hoffmann acknowledged on cross-examination that the number largely reflected lost *revenue*—not lost *profits*. The jury nonetheless awarded Hoffmann Innovations $4.1 million, or 91% of the gross revenue calculation that Hoffmann proposed. Yet Hoffmann only provided one example of a business relationship that he allegedly lost because of Clark's defamatory statements, and he said his company's profit margin was 40% of the $250,000 estimated revenue from that relationship, or $100,000. He didn't offer the company's tax returns, any profit-and-loss statements, or any other similar type of proof to prove the claimed damages. On Hoffmann Innovations' overall profit margin, all we have is Hoffmann's testimony that Hoffmann Innovations sold a "low-margin product . . . so we had to sell a lot of them."

The appropriate measure of special damages—"the loss of something having economic or pecuniary value," as the Restatement describes them—is lost profits and not lost revenue. Restatement § 621 cmt. *a*; *see Ballard v. Amana Soc'y, Inc.*, 526 N.W.2d 558, 560–61 (Iowa 1995) (per curiam). Other than Hoffmann's testimony about profits lost on this one particular client, evidence of Hoffmann Innovations' damages in this record is exceedingly sparse. Hoffmann testified that several employees needed to be shifted from their regular tasks to responding to customer complaints that flowed from Clark's defamatory statements, but he offered no evidence about the value of these services. We may alter a judgment that "lacks evidential support." *Claus v. Whyle*, 526 N.W.2d 519, 525 (Iowa 1994) (emphasis omitted). Awarding Hoffmann Innovations damages based on lost revenue—as the jury did—results in a damage award that exceeds the amount that the company would have profited had Clark never published a defamatory statement. We find the verdict as to Hoffmann Innovations' damages flagrantly excessive on this record.

The libel per se damages awarded to Hoffmann personally present a different story. Again, with libel per se, "the jury is allowed to award substantial damages without the necessity of the plaintiff proving actual damage to reputation." *Schlegel*, 585 N.W.2d at 222. Yet even though we don't impose normal standards of proof, we have said that the damages must be "the natural and probable consequences of" the statements. *Rees*, 461 N.W.2d at 839–40. In other words, there must be some connection between the actual or potential harm to the plaintiff and the damages awarded. We have also said there must be

proof of the plaintiff's good reputation and of dissemination of the defamatory statements. *Id.*

In *Lara v. Thomas*, we determined that a verdict of $10,000 in general damages and $7,500 in punitive damages was not excessive. 512 N.W.2d at 786. The plaintiff sought damages for "injury to her reputation, feelings, humiliation, and mental anguish." *Id.* She offered evidence of "her good reputation, good work record, and the extent of publication." *Id.* Similarly, in *Wilson v. IBP, Inc.*, we upheld $4,000 in compensatory damages for slander. 558 N.W.2d at 140. We held that the plaintiff had proved these damages based on evidence of the plaintiff's reputation prior to the statements and the plaintiff's testimony of emotional damage from the defamatory statements. *Id.*

In *Rees*, we set aside as excessive a $250,000 verdict against an attorney who publicly accused the plaintiff of committing extortion and ordered a new trial. 461 N.W.2d at 840. There was no evidence that the plaintiff's reputation was injured or that he suffered any significant emotional distress. *Id.*

Yet we decided *Rees* in 1990, before the means of instantaneous and large-scale distribution that Clark used to defame Hoffmann—social media and podcasts—came into existence. As one commentator has observed, "Given the ease of defaming another person through the social media, it is arguable that a remedy for defamation through presumed damages is more necessary now than ever, even if plaintiffs are not able to provide evidence of actual harm to reputation in a given case." Mike Steenson, *Presumed Damages in Defamation Law,* 40 Wm. Mitchell L. Rev. 1492, 1540 (2014). In *Bierman v. Weier,* we were

asked to decide whether libel per se had a continuing role to play in our legal system. 826 N.W.2d at 454–55. Noting technological changes that had altered the defamation landscape, we held that it did:

> This case illustrates why retaining libel per se for private plaintiff/private concern/nonmedia defendants may be appropriate. In our present-day world, accusations can be spread quickly and inexpensively, through self-publishing of a book or otherwise. A generation or two ago, it is entirely plausible that if Scott had decided to write a memoir about his life, it would have stayed by his typewriter and never been copied or distributed. Now, however, for a relatively modest price, it is possible to print 250 copies of a professional-looking book alleging that one's ex-wife is a victim of child abuse from her father. We think libel per se plays a useful role in helping to keep our social interactions from becoming ever more coarse and personally destructive.

*Id.* at 455. We specifically rejected the argument that the internet "has rendered libel per se obsolete because the targets of defamation can respond quickly at minimal cost." *Id.* at 454. We explained that we were "not persuaded . . . that the Internet's ability to restore reputations matches its ability to destroy them." *Id.*

This case involves defamation over a period of years. Scott Clark used five different Facebook accounts, two under aliases. Clark disseminated his false statements over social media and podcasts to tens of thousands of people. He said that Hoffmann was dishonest and engaged in bribery. He falsely reported that Hoffmann knowingly sold dangerous products out of greed.

Clark engaged in bad faith conduct, threatening repeatedly to harm Hoffmann unless Hoffmann paid him off. Clark posted a video depicting Hoffmann as Adolf Hitler. Hoffmann also had to watch his reputation be "torn apart online" while being limited in how he could respond because of the consent decree. Hoffmann took years to develop his reputation. As a result of what Clark

put him through, Hoffmann was "stressed to the max." He had trouble sleeping. This was "overwhelming" and "consuming."

In considering whether an award of presumed damages for libel per se is within the range of reasonableness as a natural and probable (although not necessarily proven) consequence of the defendant's conduct in this case, several questions help to focus our inquiry: (1) What was the prior reputation of the plaintiff? (2) Did the plaintiff suffer emotional distress? (3) What type of defamatory statements were made? (4) How many defamatory statements were made? (5) How widely were they disseminated?[1] (6) Over what period of time were they made and disseminated? (7) Were they ever retracted? (8) Was there evidence of bad faith?[2]

The answers to these questions support the very substantial damages that the jury awarded to Hoffmann personally. Hoffmann proved that he had built up his reputation in the car tuning industry over many years. He proved that he suffered emotional harm. He proved that there had been repeated statements to the effect that Hoffmann was a fraudster and a thief disseminated over various media and under various personae over a period of years. Clark never showed contrition for his intentional, bad-faith, abusive conduct. To the contrary, he called in more fire.

---

[1] *See Eshelman v. Puma Biotech., Inc.*, 2 F.4th 276, 284 (4th Cir. 2021) ("Where North Carolina courts have awarded million-dollar damages awards for defamation, there has been little doubt that the defamatory statements were widely publicized.").

[2] *See MacDonald v. Jacobs*, 201 A.3d 1253, 1260 (N.H. 2019) (allowing an enhanced award of compensatory damages when the defendant acted with "ill will, hatred, hostility, or evil motive" (quoting *Munson v. Raudonis*, 387 A.2d 1174, 1177 (N.H. 1978))).

In *Smith v. Iowa State University of Science & Technology*, we considered a challenge to a jury's $500,000 award for noneconomic damages—damages that can't readily be measured in money—on a defendant's claim for intentional infliction of emotional distress. 851 N.W.2d 1, 31–33 (Iowa 2014). We found the damages were within "the range of reasonableness" and declined to disturb the jury's verdict. *Id.* at 33. *Smith*, although not a defamation case, offers a frame of reference. In this case, we likewise find it within the range of reasonableness to sustain a significant damages award for an intentional, long-term, bad-faith campaign of per se falsehoods that caused emotional harm. "Presumed damages are by no means merely nominal. They may at times be quite substantial." *Law of Defamation* § 9:17; *see, e.g.*, *Clark v. Clark*, 867 S.E.2d 743, 757 (N.C. Ct. App. 2021) (upholding a $1 million award of presumed damages). We hold that the jury's libel per se damages award to Hoffmann totaling $1 million is not excessive.

Finally, as to Clark's challenge to the punitive damages award, we're reminded that punitive damages "must bear some relationship to actual damages, but there is no formula by which this 'relationship' may be determined." *McCarthy v. J. P. Cullen & Son Corp.*, 199 N.W.2d 362, 369 (Iowa 1972); *see Wolf v. Wolf*, 690 N.W.2d 887, 895 (Iowa 2005) ("[C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of *harm* to the plaintiff *and to the general damages recovered*." (quoting *State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 426 (2003))). Since we've already found the jury's compensatory damages award to Hoffmann Innovations

excessive, and punitive damages must be tied to compensatory damages, we find the punitive damages award was also excessive. The trial court abused its discretion in finding these damages not excessive.

C.

A new trial is thus warranted in this case, but we also possess "inherent power to order a remittitur as a condition to avoid a new trial." *WSH Props., L.L.C. v. Daniels*, 761 N.W.2d 45, 52 (Iowa 2008). Remittitur is an appropriate remedy when: "(1) the jury's damage award was not justified by the evidence before it; (2) the jury failed to respond to the evidence; or (3) the wrong measure of damages was applied." *Id.* (citations omitted). "If the verdicts are the result of passion and prejudice a new trial should be granted, but if they are merely excessive because not supported by sufficient evidence . . . justice may be effectuated by ordering a remittitur of the excess as a condition for avoiding a new trial." *Id.* at 49–50 (quoting *Schmitt v. Jenkins Truck Lines, Inc.*, 170 N.W.2d 632, 659 (Iowa 1969)). In granting remittitur, we reduce the award " 'to the maximum amount proved' under the record." *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 777 (Iowa 2009) (quoting *Knickerbocker v. First Nat'l Bank of Oelwein* (*In re Knickerbocker*), 827 F.2d 281, 289 n.6 (8th Cir. 1987)).

On the damages awarded to Hoffmann Innovations, as described above, the jury appears to have used the wrong measure of damages by accepting almost all of Hoffmann's proposed damages figure that used lost revenue instead of lost profits. Hoffmann only provided evidence of one client that Hoffmann Innovations lost because of Clark's defamation, resulting in a loss of about

$100,000 in net profits. We thus order a remittitur on the jury's libel per se award, reducing the $2,060,250 awards against both Clark and RealTuners to $100,000 total, or $50,000 against each. We leave undisturbed the compensatory damages awarded to Hoffmann Innovations against Scott Clark of $27,000 for breach of fiduciary duty, $102,500 for breach of contract, and $250,000 for civil extortion, and the district court's attorney fee award of $210,743.21.

Because we've ordered a remittitur on the damages for libel per se for Hoffmann Innovations—a large portion of the damages awarded in this case—remittitur is also appropriate for punitive damages. *See, e.g.*, *Wilson*, 558 N.W.2d at 148 (ordering remittitur of punitive damages from $15 million to $2 million in light of the defendant's culpability and the deterrent effect of punitive damages). The jury awarded punitive damages against Clark for $2 million and against RealTuners for $3.5 million. Having now reduced the total compensatory damages from $5,500,000 to $1,479,500—a reduction to 26.9% of the original award—we believe it appropriate to keep the jury's original ratio of compensatory-to-punitive damages by ordering remittitur of punitive damages by this amount. We therefore order remittitur of punitive damages against Clark personally from $2 million to $538,000 and against RealTuners from $3.5 million to $941,500.

### III.

If a remittitur is ordered, the plaintiff must choose "between consenting to a reduced, modified or increased judgment amount or proceeding to a new trial."

Iowa R. Civ. P. 1.1010(2). At oral argument before this court, Hoffmann's lawyer stated that his client preferred remittitur over a new trial, but didn't propose a particular remittitur amount. In any event, Hoffmann and Hoffmann Innovations must now accept or reject these remittitur conditions under Iowa Rule of Civil Procedure 1.1010(2). If the plaintiffs refuse or fail to accept these remitted judgment amounts, the district court must set aside the verdict and order a new trial on damages. *Id.* r. 1.1010(2)(*b*).

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

All justices concur except Christensen, C.J., who takes no part.